

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 25, 2000

By Federal Express
Sharon Gervasoni
United States Parole Commission
One North Park Building
5550 Friendship Boulevard
Chevy Chase, Maryland 20815

Re: Christopher Furnari Reg. No. 19815-054

Dear Ms. Gervasoni:

The Government respectfully submits this letter in connection with the Commission's upcoming consideration of Furnari's parole. In submissions to the Commission dated August 1, 1996 and December 11, 1996, and in my appearance at a December 3, 1996 hearing at FCI Allenwood, I expressed this Office's strenuous opposition to Furnari's early release. Because of a recent decision from the United States Court of Appeals for the Third Circuit, Furnari v. Warden, 218 F.3d 250 (July 12, 2000), Furnari is back before the Commission for reconsideration. As set forth in more detail below, we continue to oppose Furnari's release, because of his violent past, the danger he will likely pose to the community upon his release, and the likelihood of his return to a position of power in the Luchese Family.

Procedural History

After the 1996 proceedings, the Commission consigned Furnari to offense Category Eight and denied him reconsideration until 2011. This action was based, at least in part, upon the Government's submissions, in which I cited several acts of violence in which Furnari either directly participated, or for which he was ultimately responsible as a ruling member of the Luchese Organized Crime Family of La Cosa Nostra. The information concerning those acts of violence came from several cooperating witnesses, including Anthony Casso, who was a protege of Furnari, and who rose to the rank of Consigliere and Underboss

Sharon Gervasoni
September 25, 2000

of the Luchese Family.

As reported in <u>Furnari</u>, 218 F.3d at 250, Furnari later sought review of the Commission's decision in a habeas corpus petition filed in the United States District Court for the Middle District of Pennsylvania. Furnari's principal argument in support of his petition was that Casso was unreliable. While the petition was pending, Furnari had a statutory interim hearing before the Commission. <u>Id</u>. In support of his habeas corpus petition, and at the interim hearing, Furnari submitted a copy of a Government affidavit that had been filed in an unrelated case in the Eastern District of New York (the "EDNY Affidavit").[1] The affiant, AUSA George Stamboulidis of the Eastern District of New York, explained that Casso had breached his cooperation agreement by, among other things, committing crimes while incarcerated and lying about certain matters. Nonetheless, both the Commission and the judge presiding over Furnari's habeas corpus petition denied Furnari any relief. The Third Circuit reversed principally because the Commission had failed to articulate its basis for denying Furnari parole, particularly in the face of the "new evidence" contained in the EDNY Affidavit. Id. at 256-57. Notwithstanding the EDNY Affidavit, we believe that there is more than ample evidence to support the denial of Furnari's parole.

## The EDNY Affidavit and the Government's Reliance on Casso

Absent a clear understanding of the record, it may appear from the <u>Furnari</u> decision that this Office and the United States Attorney's Office in Brooklyn ("USAO EDNY") took conflicting positions concerning Casso and his reliability. That simply is not the case. Indeed, despite the representations in the EDNY affidavit, which we have no reason to contest, we believe that the information presented in our 1996 submissions is credible and reliable. Moreover, prior to its submission to the Commission, my August 1, 1996 letter in which I set forth Casso's allegations was vetted by the EDNY USAO. When the EDNY determined in late 1997 that Casso had breached his cooperation agreement, and thus terminated its relationship with him, I again spoke to the EDNY USAO and was informed that the information concerning Furnari was not a basis for Casso's termination, and that much of Casso's historical information was believed to be

---

[1] A copy of the EDNY Affidavit is attached for your convenience as Exhibit A.

2

Sharon Gervasoni
September 25, 2000

credible, particularly because it had been corroborated in large measure by other sources. Consequently, no action was taken concerning our previous submissions to the Parole Commission concerning Furnari.

The EDNY Affidavit was submitted to the court in Casso's own case and sets forth the sequence of events that led from the initiation of his cooperation to the termination of his agreement with the Government. As set forth in the affidavit, Casso's cooperation agreement was terminated because (1) Casso withheld certain information, none of which was related to Furnari or Casso's own prior racketeering activity, (2) he committed various crimes while in jail, and (3) he attempted to falsely impeach other Government witnesses. The bases for these conclusions are summarized below.

First, in 1994, during the initial debriefings of Casso that followed the execution of his cooperation agreement, the EDNY USAO believed that Casso was being less than candid concerning his earlier plots following his arrest to kill a judge and an AUSA, and to escape from jail. EDNY Aff. at ¶ 6. Indeed, the results of a polygraph examination indicated that Casso was deceptive on these issues. Id. at ¶ 7. Despite these concerns, as of September 1996, the EDNY still considered Casso to be a prospective witness in various matters, including the prosecution of Vincent "Chin" Gigante, the boss of the Genovese LCN Family. Id. at ¶¶ 21-22. Among the reasons the EDNY had for its continued confidence in Casso was the fact that, as for historical information concerning the racketeering activities of the LCN, Casso was corroborated in many respects by other witnesses, including former Luchese hierarchy members Peter Chiodo and Alfonso D'Arco. Id. at ¶¶ 22-23. As you may recall, both Chiodo and D'Arco were relied upon, in addition to Casso, in our 1996 submissions concerning Furnari. Thus, by August and December 1996, when we submitted our letters to the Commission, Casso was still considered to be a credible and viable witness for organized crime prosecutions. Accordingly, my representation to the Commission at the December 3, 1996 hearing in this regard was completely accurate.

It was not until several months later, in April 1997, after the Parole Commission had rendered its decision denying Furnari parole, that Casso's relationship with the Government began to deteriorate markedly. At that time, Casso admitted to EDNY prosecutors that he had assaulted a fellow inmate,

3

instigated another assault of that inmate, and later lied about it to prison officials. In addition, Casso admitted that, with the help of prison employees he had bribed, Casso had smuggled various contraband into the protective custody units where he was housed.[2] Id. at ¶¶ 25-28. The EDNY prosecutors had these disclosures under review for several months thereafter, and had not made any decision that would affect Casso's availability as a witness until at least August 1997. Id. ¶ 34.

However, in a letter from Casso's counsel dated August 1, 1997, Casso alleged that D'Arco and Salvatore Gravano -- a former Gambino LCN member who had cooperated with the Government – had given false testimony in the Gigante prosecution.[3] Casso's allegations were discounted by the EDNY USAO for several reasons. For instance, both D'Arco and Gravano had given the same or similar testimony in other proceedings prior to the Gigante competency hearing and "repeatedly withstood the crucible of cross-examination by teams of very skillful attorneys." Id. at ¶ 35. In addition, some of Casso's allegations against Gravano were patently false, and Casso later backed away from them. See id. ¶¶ 35-37, 39. Moreover, Casso's allegations appeared to be motivated by his realization that he would not be called to testify in the Gigante case, and thus would lose an opportunity to have his sentence reduced as a reward for his cooperation. Id. at ¶ 39.

---

[2] In approximately February 1997, this Office arrested and prosecuted a corrupt Bureau of Prisons employee who was smuggling contraband into a protective custody unit at FCI-Otisville for two inmates. During the course of the investigation that continued after those arrests, somewhat sketchy information surfaced that inmates other than the defendants, including Casso, had engaged in similar conduct with the same BOP employee. Not long after this revelation, Casso disclosed this conduct to the EDNY prosecutors. The results of our investigation did not undermine our faith in Casso's historical information since it had been extensively corroborated by other Government witnesses and independent investigative means.

[3] By late 1997, both D'Arco and Gravano had testified in Gigante's hotly contested competency hearing. After he was found competent, Gigante went to trial, after which he was convicted of racketeering and sentenced to twelve years in prison.

Sharon Gervasoni
September 25, 2000

On September 5, 1997, after reviewing Casso's false allegations, as well as his April 1997 disclosures concerning his criminal activities in jail, the EDNY determined that Casso had violated the provisions of his cooperation agreement that precluded Casso from, among other things, "providing false, misleading or incomplete information," and from "committ[ing] or attempt[ing] to commit any further crimes." Id. at ¶¶ 4, 35. Among the bases cited by the EDNY for this conclusion were Casso's bribery of prison employees, assault of another inmate who had provided information about Casso's criminal activities while in jail, and Casso's false allegations about Gravano and D'Arco. Id. ¶ 35. Thus, the affidavit clearly suggests that the EDNY's decision to terminate its relationship with Casso was based on Casso's activities after he had cooperated and not because his information on his own and others' racketeering activities was deemed to be incredible. Indeed, this fact was confirmed for me by the EDNY in late 1997, after the EDNY Affidavit was submitted to the court.

### The Information Concerning Furnari

In any event, as set forth in our August 1 and December 11, 1996 letters to the Parole Commission, there is ample evidence of Furnari's violent past, and likely violent future if released, that warrants a rejection of his parole application.[4] Indeed, much of this information stands whether Casso is credited or not.

In the August 1, 1996 letter, we presented information concerning Furnari's direct role in the murder of Lee Schleifer, the conspiracy to murder Richard Taglianetti, the attempted murder of Joseph Abinanti, a conspiracy to murder Frank Decicco and others, an assault of James Wolford, and a conspiracy to assault or murder Joseph Martinelli. I will not repeat those allegations here, but only emphasize the corroboration for several of these incidents.

1. <u>Lee Schleifer homicide</u>: The information provided by Casso, that Furnari ordered the execution of Schleifer in 1975, was independently corroborated by Thomas "Tommy Irish" Carew. Carew was a Luchese Family associate for many years, has pleaded

---

[4] Copies of my August 1 and December 11, 1996 letters are attached as Exhibits B and C, respectively.

Sharon Gervasoni
September 25, 2000

guilty to various racketeering offenses, and has testified pursuant to the terms of his cooperation agreement with the Eastern District of New York. In fact, Carew reported that, while Casso lured Schleifer to a Brooklyn social club and then murdered him, both Carew and Furnari waited together at a nearby restaurant until the murder was committed. According to Carew, he and Furnari met Casso at the social club after the murder, and Schleifer's body was removed and then dumped on a Brooklyn Street. This murder was committed while Furnari was Casso's capo, and, according to LCN protocol, Casso could not commit the murder without Furnari's approval.

2. <u>Conspiracy to Murder Richard Taglianetti</u>: Carew also corroborated Casso's account of Furnari issuing a contract to murder Richard Taglianetti. As set forth in the August 1, 1996 letter, various steps were taken by Casso and others to carry out Furnari's contract, but Taglianetti was not located and murdered until 1992 by Luchese Family member George Conte. Furnari's role, and the reason he ordered the murder (to avenge Taglianetti's role in the murder of the son of Luchese member Angelo Defendis) has been corroborated by other Government witnesses and former Luchese Family members D'Arco and Frank Gioia, Jr., both of whom have testified for the Government on numerous occasions. In addition, the fact that the contract was reportedly issued in the early 1980's when Furnari was a member of the Luchese Family Hierarchy gives more reason to credit the accounts of these witnesses.

3. <u>Assault of James Wolford</u>: Former Luchese member Peter Chiodo also corroborates Casso's report of Furnari's order to give a "beating" to Wolford, who was a Board member of the International Painter's Union and was interfering with Furnari's extortionate control of the union. Chiodo and Carew carried out the order. In addition to Chiodo, however, another cooperator, Corrado "Dino" Marino, has confirmed Chiodo's account and Furnari's role in the assault. Marino was a Luchese Family associate who pleaded guilty to racketeering in the EDNY and has testified pursuant to a cooperation agreement with the EDNY USAO. In particular, Marino has stated that he had been approached by union officials who complained about Wolford. Marino then passed the complaint on to Furnari, and shortly thereafter Chiodo reported to Marino that Furnari had ordered the beating.

4. <u>Conspiracy to Assault Joseph Martinelli</u>: As set forth in our August 1, 1996 letter, information concerning

6

Sharon Gervasoni
September 25, 2000

Furnari's role in the conspiracy to assault Joseph Martinelli was provided by Chiodo, and corroborated in substantial detail by Carew, D'Arco, and Casso.

In addition, and as set forth in more detail in our December 11, 1996 letter to the Commission, Furnari led a crew of Luchese Family members and associates that -- between the 1970's and mid-1980's when Furnari was incarcerated -- was responsible for thirteen murders and an attempted murder (including that of Schleifer). As we reported, several cooperators, including D'Arco, have stated that such murders would not be committed without the knowledge or approval, tacit or express, of the crew's capo (i.e., Furnari). Moreover, from D'Arco and other sources, we believe that, immediately prior to his conviction, Furnari and the other members of the Luchese Family hierarchy orchestrated the rise of Casso and Amuso to replace them. In the wake of these promotions, the hierarchy that included Furnari also agreed to have Anthony Luongo murdered. Luongo had been vying to replace Furnari's codefendant Anthony Corallo as boss of the Luchese Family instead of Amuso. It was believed that murdering Luongo would eliminate any division in the Family that might result from the appointment of the new administration.

### Furnari's Potential to Return to the Luchese Family

As we indicated in our August 1, 1996 letter, we have learned from several confidential sources that Furnari is a revered and almost mythical figure in the Luchese Family, who would be received by them with open arms. The disarray of that Family has continued since 1996, with members of the present Luchese Family hierarchy being either convicted of or indicted on state and federal racketeering charges. Thus, the Luchese Family is starving for the type of strong and trusted leadership that was the hallmark of Furnari's legendary role in the Family. We continue to believe that, should Furnari be prematurely released on parole, he will return to the fold, and resume his racketeering activities at the expense of many innocent victims.

### Conclusion

There is no reason to conclude that, although Casso breached his cooperation agreement and is no longer cooperating with the Government, his information concerning Furnari should not be accepted. First, the circumstances that led to his termination did not touch upon the historical information he had

7

Sharon Gervasoni
September 25, 2000

provided. And as set forth above, much of Casso's information about Furnari has been corroborated in substantial measure by other credible witnesses. Indeed, even without Casso's information, there is compelling information concerning Furnari's role in two murders and two assaults. Moreover, from cooperators other than Casso, we believe that, as a capo and consigliere, Furnari was at least indirectly responsible for at least eleven murders. Finally, Furnari has the capacity to fill an important void in the Luchese Family should he be released. If past behavior provides any basis to predict future dangerousness, Furnari certainly poses a grave danger to society and should be forced to serve the remainder of his sentence.

> Very truly yours,
>
> MARY JO WHITE
> United States Attorney
>
> By: _____
> DAVID N. KELLEY
> Chief, Organized Crime and
>    Terrorism
> Tel.: (212) 637-1025